**UNITED STATES, Appellee,**

v.

**Charles Donald LEMA,**
**Defendant, Appellant.**

No. 89–2107.

United States Court of Appeals,
First Circuit.

Heard June 5, 1990.

Decided July 18, 1990.

562

Thomas J. Connolly, Portland, Me., for appellant.

Charles D. Lema, on brief pro se.

F. Mark Terison, Asst. U.S. Atty., Portland, Me., with whom Richard S. Cohen, U.S. Atty., Augusta, Me., was on brief for appellee.

Before CAMPBELL and SELYA, Circuit Judges and COFFIN, Senior Circuit Judge.

COFFIN, Senior Circuit Judge.

Charles Donald Lema appeals his convictions for aiding and abetting the possession with intent to distribute over 500 grams of cocaine, and for conspiracy to do so. His appointed counsel has raised a single issue on review: whether the evidence was sufficient as a matter of law to find that Lema aided and abetted. In addition, Lema has filed a *pro se* brief in which he argues that the district court erred by denying his motions for new trial and judgment of acquittal based on ineffective assistance of counsel and prosecutorial misconduct. We affirm both the convictions and the denials of the motions.

## FACTS

Alex Hood, Jr., a cocaine dealer since 1985, began to cooperate with the Drug

Enforcement Administration (DEA) in approximately October 1988 in connection with a plea agreement. Hood told DEA agents that he had been supplied drugs by Raymond Souza, Jr. on occasions between February 1987 and April or May 1988. In cooperation with the government, Hood arranged to purchase a kilogram of cocaine from Souza on December 15, 1988.

Hood and Souza agreed to meet at a liquor store in New Hampshire to complete the transaction. Prior to the meeting, Hood was fitted with a transmitter by government agents so that the discussions could be recorded. When Hood arrived, Souza was waiting for him in the parking lot in a red truck. The defendant, Lema, was a passenger in that truck. A Chevrolet Nova was parked nearby in which two other individuals waited. Souza got out of the truck and approached Hood. Lema remained in the truck. Hood informed Souza that the purchaser of the cocaine refused to take his money out of Maine and that the transaction therefore needed to be completed in Kittery, Maine.

Souza objected strenuously to this change of plan. He walked over to the truck and appeared to have conversation with Lema. He then went over to the Nova and again appeared to have conversation. After these discussions, he returned to Hood and agreed to follow Hood to Kittery. Hood drove his own vehicle to Maine, followed by Souza and Lema in the truck. The occupants of the Nova did not follow. The parties proceeded to Valle's Charterhouse restaurant and motel in Kittery.

In the parking lot at Valle's, the exchange was completed. Hood removed a bag of money from the trunk of a red Firebird parked nearby. He handed it to Souza. He testified that Souza passed the bag to Lema, asking, "Is it all here?" Lema reportedly replied, "It looks like it." Souza then passed the cocaine, which was inside a McDonald's Happy Holidays bag, to Hood. Souza said to Lema, "Let's get out of here. I'm nervous." Lema responded, "Let's get the —— out of here." Souza and Lema drove away. Tests revealed that the bag contained 1005 grams of 95% pure cocaine.

Souza contacted Hood later that night and expressed interest in another transaction. Negotiations ensued over the next few weeks for the purchase of ten kilograms of cocaine. During this time, Hood introduced Souza to Michael Bansmer, a DEA agent who was posing as a buyer. Souza was ultimately unable to deliver ten kilograms, and agreed to sell three. Arrangements were made to deliver the drugs, again at Valle's, on January 25, 1989.

During these negotiations, Lema never was mentioned or present. On January 25, however, Lema again was a passenger in Souza's truck. This time, the Chevrolet Nova also was present in Kittery, driven by Alberto Leon Monsalve–Zapata. Once again, Hood was fitted with a transmitter. When Hood and Bansmer arrived, Souza, Lema and Monsalve–Zapata were inside the restaurant. Souza met Hood and Bansmer near the door. Lema and Monsalve–Zapata were near the souvenir counter, some five to ten feet away.

Souza informed Hood and Bansmer that the drugs were in the car that Monsalve–Zapata had driven. The evidence was somewhat conflicting, but, taken in the light most favorable to the government, Souza also apparently told Monsalve–Zapata to get the cocaine while Lema was standing nearby. Monsalve–Zapata left the restaurant. Shortly thereafter, the others left the restaurant, Hood and Bansmer first, followed by Souza and then Lema.

Hood and Bansmer drove around the side of the motel to the room they had rented for completion of the sale. As they went, they observed Souza, Lema and Monsalve–Zapata standing together near the truck and car, which were parked on the side of the building and not visible from the restaurant foyer. Hood and Bansmer told Souza to meet them at the room, and gave them the number. Shortly after Hood and Bansmer reached the hotel room, Souza and Lema drove up in the truck. Bansmer, watching from the window, saw the truck pull up, and, together with Hood, went

outside to meet Souza and Lema. Bansmer asked if Souza had "the package." Souza said that he had it in the truck. When Bansmer asked to see it, Souza asked Lema to pass it out. Lema handed Souza an opaque plastic shopping bag from a retail clothing store. Souza in turn gave the bag to Bansmer and Hood.

Hood carried the bag into the motel room. Bansmer and Souza followed, while Lema remained in the truck. After "flash testing"[1] the cocaine, Bansmer asked Souza how much money was owed. After receiving an answer, Bansmer indicated that he had to go to a different motel room to get the money. He took the cocaine next door, where the surveillance team was waiting. Government agents then entered the room where Souza was waiting and arrested him. Lema was arrested in the parking lot.

The government presented this evidence via testimony from informant Hood and agents Bansmer and Lear, the agent in charge of the operation. Defendant called DEA agent Bradford as his only witness, and the questioning was directed at the inexpertness of government surveillance at the New Hampshire liquor store location. No transcripts or tapes of the transactions were presented to the jury to corroborate the testimony of government witnesses, though the tapes were the subject of extensive cross-examination. At the end of the government's case and again at the close of the evidence, Lema moved for a judgment of acquittal. The motion was denied. The jury returned a verdict against Lema on all counts on August 9, 1989.

## MOTION FOR NEW TRIAL

Rule 33 allows the district court, on motion of a party and in the interest of justice, to grant a new trial. A new trial motion must be made within seven days after a verdict or finding of guilty unless "based on the ground of newly discovered evidence," in which case it may be made within two years after final judgment. Fed.R. Crim.P. 33.

On September 13, 1989, over a month after the verdict, Lema filed a series of *pro se* motions, among them a motion for new trial based on the ineffective assistance of counsel. At that time, he filed no memorandum in support of his motion. The motion was somewhat confusing, but asserted two specific failures of his counsel. First, he claimed that his trial counsel was aware of notes in the file of a co-defendant's attorney that stated that Lema "kn[e]w nothing about what was going on at the time of the arrest and he never handed a package to any agents on the day in question." Second, he argued that the failure to call this attorney as a witness amounted to ineffective assistance of counsel.

Without holding an evidentiary hearing or reaching the merits, the district court denied the motion for new trial on October 25, ruling that it lacked jurisdiction to consider the motion because a claim of ineffective assistance of counsel was not newly discovered under the rule when the facts underlying the claim were known to the defendant at the time of trial; the motion therefore had to be filed within seven days of the verdict. The court also found that the defendant had not shown that the alleged failures of counsel, i.e., the failures to pursue or call a potential witness, were in fact newly discovered despite due diligence. For both reasons, the court held that the motion was time-barred.

Three weeks after this decision, on November 14, 1989, the defendant filed two memoranda. The first was entitled "Memorandum of Law in Support of motion for new trial and new appointment of Counsel. Rule 33, FCP. [sic] For ineffective assistance of Counsel." The second purported to be a "Memorandum of Law in support of motion for new trial or acquittal Rule 29 F.C.P. [sic] Rule 33 F.C.P. [sic] Prosecution Misconduct. New Discovered Evidence." In his first memorandum, in support of his *pro se* motion for new trial, Lema contended for the first time that his attorney was inadequate by failing to do appropriate pre-

---

**1.** "Flash testing" involves dissolving a small amount of cocaine in a glass of water to roughly test its purity—the faster the substance dissolves, the more pure the sample.

trial discovery or investigation into the existence of audiotapes made by the government when monitoring the transactions. He claimed that the tapes would belie some of the testimony of government witnesses. In particular, he claimed that the tapes would show that, during the first Kittery transaction, he never stated that the money appeared to be there or that he said "Let's get the —— out of here." [2]

On appeal, Lema asserts that his claim of ineffective assistance of counsel meets the rule's requirement for newly discovered evidence, and that he is therefore entitled to file a motion for new trial within two years of the verdict.[3] In support of this claim, he makes two arguments. First, he argues that a claim of ineffective assistance of counsel is "newly discovered" for purposes of the rule when it is brought before the court for the first time, even when the facts on which the claim is based were known to the defendant at the time of trial. Second, he contends that he was unaware that tapes existed until he examined his attorney's file and discovered transcripts of some of the monitored conversations. He claims that he was misled into believing that no tapes existed because a government witness testified that, due to operator

error, no tapes ever were recorded. He says that his counsel was deficient in failing to obtain the actual tapes.[4]

Rule 33 provides seven days in which a motion for new trial may be filed, unless there is newly discovered evidence. As this court has held, the rule is jurisdictional, *see United States v. Fontanez*, 628 F.2d 687 (1st Cir.1980), and the district court is without discretion to grant a motion for new trial that is not timely filed. *See id. See also* J. Moore, 8A *Moore's Federal Practice* ¶ 33–02(2)(a) (2d ed. 1990).

■ This circuit has never decided whether a claim of ineffective assistance of counsel based on information known to the defendant at the time of trial, when raised to the district court for the first time, is newly discovered for the purposes of Rule 33.[5] The circuit courts that have addressed the issue, with one exception, have held that such claims are not newly discovered under the rule, accepting the notion that "[n]ewly discovered evidence must be newly discovered evidence." *United States v. Ellison*, 557 F.2d 128, 133 (7th Cir.1977). *See also United States v. Miller*, 869 F.2d 1418, 1421–1422 (10th Cir.1989); *United States v. Ugalde*, 861 F.2d 802, 806–807

**2.** In the second memorandum, Lema contended that the government had engaged in prosecutorial misconduct by knowingly allowing government witnesses to testify falsely. Specifically, although he provided no evidence beyond bald allegations, he accused the government of deliberately concealing and/or destroying the tape recordings made on December 15 and January 25 and then allowing false testimony concerning the content of those conversations, citing *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), and *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Lema, however, never mentioned prosecutorial misconduct in his initial motion for new trial. His memorandum raising the issue was not filed until three weeks after the court had ruled on his motion for new trial, which itself was denied a month after the motion was filed. Since he did not renew his motion after the district court's order, the court properly never considered the claim.

**3.** Lema again raises the issue of prosecutorial misconduct in his appellate brief. However, because the claim never was before the district court, *see supra* n. 2, we do not address it here. We note, however, that Lema's claim that the

prosecutorial misconduct was newly discovered is based on the same alleged "discovery" of the existence of tapes on which he bases his claim of ineffective assistance of counsel. As we note *infra* at 567–568, the record reveals that Lema was aware of the existence of tapes and transcripts at the time of trial.

**4.** Lema does not contest on appeal the district court's finding, made in response to his original new trial motion, that counsel's failure to call a witness who allegedly would give exculpatory evidence does not amount to newly discovered evidence under the rule. We therefore do not discuss the claim.

**5.** In *United States v. McCambridge*, 551 F.2d 865, 873 (1st Cir.1977), the court declined to reach the issue. Again, in *United States v. Martorano*, 620 F.2d 912 (1st Cir.1980) (en banc), *aff'g* 457 F.Supp. 803, 805 (D.Mass.1978), the court expressed no opinion concerning the district court's decision that the claim did not constitute newly discovered evidence. Because the *Martorano* district court had treated the motion as a motion to vacate sentence under 28 U.S.C. § 2255, the point had no effect on the outcome of the appeal.

(5th Cir.1988); *United States v. Brown*, 742 F.2d 363, 368 (7th Cir.1984); *United States v. Dukes*, 727 F.2d 34, 39 (2d Cir. 1984); *United States v. Holy Bear*, 624 F.2d 853, 856 (8th Cir.1980); *United States v. Lara–Hernandez*, 588 F.2d 272, 275 (9th Cir.1978); *United States v. Allen*, 554 F.2d 398, 404–405 (10th Cir.1977). Courts have applied the rule despite the fact that the defendant might not have appreciated the legal significance of the information until some time later. *See Ugalde*, 861 F.2d at 806 (and citations therein).

We agree. In the first place, the text of the rule itself requires that the *evidence* be newly discovered. Moreover, courts have given a narrow meaning to the phrase "newly discovered," holding that the defendant must demonstrate not only that the evidence was unknown or unavailable at the time of trial, but also that "failure to learn of the evidence was not due to lack of diligence by the defendant." *United States v. Wright*, 625 F.2d 1017, 1019 (1st Cir.1980). *See also United States v. Martin*, 815 F.2d 818, 824 (1st Cir.1987). An interpretation that would consider facts known at the time of trial to be "newly discovered," if cloaked in the garb of a claim of ineffective assistance of counsel, flies in the face of the plain meaning of the rule and the traditional understanding of the narrowness of the time exception.

Of the circuits that have decided the issue, only the District of Columbia Circuit has not adopted this view. *See United States v. Brown*, 476 F.2d 933, 935 n. 11 (D.C.Cir.1973); *United States v. Thompson*, 475 F.2d 931, 932 (D.C.Cir.1973). But

it apparently originally reached its conclusion in an effort "to ameliorate the differences between the direct appeal and habeas standards for reviewing ineffective assistance of counsel claims in that Circuit," *Ugalde*, 861 F.2d at 806. *See also Ellison*, 557 F.2d at 133.[6] In this circuit, however, the same standard applies in both settings. *Compare United States v. Caggiano*, 899 F.2d 99, 101 (1st Cir.1990) (direct appeal) *with United States v. Carbone*, 880 F.2d 1500, 1501 (1st Cir.1989) (review of denial of motions under Fed.R.Crim.P. 33 and 28 U.S.C. § 2255). Moreover, we are not persuaded that such a distinction supports a result contrary to the plain language of the rule. *See Ellison*, 557 F.2d at 133–134 n. 3 (same finality interests come into play in new trial motion filed more than seven days after the verdict as in collateral attack). We therefore hold that a claim of ineffective assistance of counsel is not newly discovered for the purposes of Rule 33 when based on facts known to the defendant at the time of trial.

Thus, Lema may bypass Rule 33's seven-day time limit only if his claim that his counsel failed to discover and/or review the tapes was based on information unavailable to the defendant at the time of trial.[7] Lema suggests that he did not know that tapes existed until after trial because DEA agent Bradford testified that the agents failed to operate the recording machinery properly so that no tape ever was made. Lema claims that he became aware that some tapes had been produced when he received materials from his attorney

---

6. In the District of Columbia Circuit at the time the rule was adopted, "[a] claim of ineffectiveness [wa]s said to require 'a more powerful showing of inadequacy' to sustain a collateral attack than to warrant an order for a new trial by the District Court or on direct appeal." *United States v. Thompson*, 475 F.2d at 932 n. 3 (quoting *Bruce v. United States*, 379 F.2d 113, 117 (D.C.Cir.1967)).

7. We note that because this precise basis for defendant's claim of ineffective assistance of counsel (i.e., that counsel did not discover or adequately review the tape recordings of the cocaine transactions) was not raised to the district court until after the court had ruled, we technically need not reach the point. However,

because we have chosen for equitable reasons to entertain the defendant's *pro se* claims despite his representation by counsel, this case is already in an unusual procedural posture. In addition, as we discuss *infra*, it is apparent from the record and trial testimony that the defendant was aware of the existence of tapes and transcripts at the time of trial, and thus that the court was jurisdictionally barred from granting the motion. For the sake of judicial economy, we will address the point now, rather than anticipate defendant returning to the district court with yet another motion for new trial on a meritless claim that the ineffectiveness of his trial counsel was newly discovered for this reason.

after trial, including partial transcripts of conversations.

 Lema's claim cannot stand up to a review of the record. First, Bradford's testimony was only that, due to government error, there was no tape made of the conversations at *the New Hampshire liquor store.*[8] Thus Lema cannot properly claim to have been misled about the existence of tapes of the Kittery discussions. Moreover, during the testimony of Agent Lear at trial, it was apparent that tapes were available of the Kittery transactions and that transcripts had been made of those recordings, although the recordings were partially unintelligible. Lema's defense counsel engaged in extensive cross-examination on the issue, attempting to establish that there were no recordings that backed up the testimony of the government's witnesses.

Q [by defense attorney Pomeroy]: Is there a recording or a tape that has Lema's words on it, Lema's voice on it, on December 15th?

A [by Agent Lear]: *There is a tape, but I don't know if your client's voice is on it. It's not a very audible tape.*

. . . . .

Q: Do you know of any transcript or any tape that has Lema's voice on it?

A: Not that I know of.

. . . . .

Q: All right. Do you have any tape that has Lema's words, yeah, it's all there, or has Souza saying to Lema, count it and make sure it is all there?

A: *I would have to look at the transcript* to see what was said, what was picked up and what was audible.

8. Bradford testified as follows:

 A: I was contacted by Dale Lear and he advised me that he had been reviewing the tapes and that there was nothing recorded on the tape that we had made at the New Hampshire location and we knew that was the tape because we had signed it and marked it and everything.
 Q: Now, you blame that on the unfamiliarity with the recording equipment, whose unfamiliarity?
 A: Actually, Agent DeRice's unfamiliarity.
Bradford Testimony at 105.

Q: This is August and we are trying the case. Are you aware of any?

MR. GESS: Your Honor, I object. *Mr. Pomeroy has had these tapes since February.* He can do it, too. This is not appropriate.

. . . . .

Q: ... I asked you whether you have any tapes that had either—either that have Lema's voice on it saying yeah, it is all there or having Souza say to Lema here, count it and make sure it is there, or something like that.

A: And again I would have to answer that *I would have to look at the transcript to see what had been audible on the tape.*

Lear Transcript at 24–27 (emphasis added).

Q: *Are you aware of any tapes, either the tape itself or transcript of the those [sic] tapes, which contain Lema's voice and he says—when he allegedly said— let's do the deal and get out of here?*

A: *I'm not aware.*

Lear Transcript at 40 (emphasis added).

As these passages from the testimony make abundantly clear, Lema was aware at the time of trial that there were tape recordings of the Kittery transactions. The government witnesses never claimed that the Kittery conversations were not recorded, though they did indicate that the tapes were largely inaudible. The trial transcript itself reveals that those tapes and transcripts existed and that defendant's attorney had access to the tapes for several months prior to trial. In addition, the docket record reveals the existence of tapes.[9]

9. In response to the district court's initial order, counsel met to discuss discovery. The substance of that meeting is recorded in a letter from Mr. Pomeroy to Mr. Gess that was filed with the district court together with a motion for additional discovery. The letter, dated March 8, 1989, specifically states:

 This letter will merely outline what you and I discussed during our telephonic conference this morning:

 . . . . .

 3) *SURVEILLANCE PHOTOGRAPHS AND RECORDINGS:*

While it appears to us from the form of the questioning that Lema's attorney had informed himself of the contents of those tapes, we do not make that determination. There is no doubt that Lema was aware at the time of trial of the existence of tapes and transcripts of the conversations to which government witnesses were testifying. If he believed that these tapes contained exculpatory evidence and that more discovery should have been done or that his attorney inadequately represented him in this regard, he was able to raise the issue within the seven-day period governing motions for new trial. His "discovery" that there were transcripts was in fact no discovery at all.

We therefore hold that the defendant's motion for new trial was not timely filed under Fed.R.Crim.P. 33 because it was not based on newly discovered evidence.[10] We express no opinion as to the merits of the defendant's claim that his counsel was ineffective by failing to review the content of tape recordings. We hold merely that the defendant has not properly raised these issues in a timely motion for new trial and that the district court was therefore without jurisdiction to grant a new trial on that basis.

## MOTION FOR JUDGMENT OF ACQUITTAL

On September 21, Lema filed a motion for judgment of acquittal under Rule 29(c),

> I understand that there were photographs taken by surveillance agents, of the two (2) incidents, one allegedly occurring on December 15, 1988, and the other occurring on January 25, 1989, *and that you will have copies of the* photographs and *audio recordings for our review sometime next week*
> ....

Attachment to Monsalve–Zapata Docket Number 4 (emphasis added). Clearly the defendant was on notice that there were tape recordings prior to trial. Moreover, both the government's response to the defendant's pretrial motions and the district court's order on the request for additional discovery referred to the fact that the government had already made these tapes available. Monsalve–Zapata Docket Numbers 8 and 10.

**10.** We also reject defendant's claim that he was entitled to an evidentiary hearing on newly dis-

asserting, as in his new trial motion, the ineffective assistance of his trial counsel. In conjunction with the motion, Lema filed a memorandum in support of the motion and an affidavit. In these he discussed why the district court. could consider an untimely motion under Rule 29 and why a claim of ineffective assistance of counsel was newly discovered for the purposes of Rule 33. The memo did not provide any discussion of the availability of a Rule 29 motion to address a claim of ineffective assistance of counsel. In addition, the only basis for the claim of ineffective assistance of counsel that it suggested was that counsel had been ineffective by failing to file a Rule 29 motion.[11]

■ The district court never expressly ruled on the *pro se* motion for judgment of acquittal. However, a motion for judgment of acquittal, like a motion for new trial, must be filed within seven days of the verdict. Unlike Rule 33, which allows a two-year period for filing motions for new trial based on newly discovered evidence, Rule 29(c) provides no exception to the seven-day time limit. Lema's motion, filed 35 days after the verdict, thus was not timely.

Lema argues that, despite the lateness of the motion, the court continued to have jurisdiction to consider a motion out of time or to grant a judgment of acquittal *sua sponte*. This court has never decided whether the time requirements of Rule

covered evidence. A motion for new trial pursuant to Rule 33 is frequently ruled upon without hearings. *See* J. Moore, 8A *Moore's Federal Practice* ¶ 33.03(3) at 33–24 (2d ed. 1990) (citing cases). Where, as here, the record indisputedly showed that the tape recordings were not newly discovered, there was no error in not holding an evidentiary hearing. The merits properly never were reached; thus, an evidentiary hearing on the merits was not required.

**11.** In the face of the fact that counsel had already made a Rule 29 motion at the end of the government's case and at the end of the evidence, thus preserving the issue for appeal, we are unable to understand the basis for Lema's claim that failing to file an additional motion after the jury was dismissed could constitute ineffective assistance.

29(c), like those of Rule 33, are jurisdictional. *See United States v. Godoy,* 678 F.2d 84, 88 (9th Cir.1982) (jurisdictional); *United States v. Johnson,* 487 F.2d 1318, 1321 (5th Cir.1974) (same); *Rowlette v. United States,* 392 F.2d 437, 439 (10th Cir.1968) (same). *But see United States v. Coleman,* 811 F.2d 804, 807 (3d Cir.1987) (court allowed late motion where extension was timely requested but where court did not grant extension until three weeks later); *United States v. Giampa,* 758 F.2d 928, 936 n. 1 (3d Cir.1985) (court retains jurisdiction to grant judgment of acquittal *sua sponte* ); *United States v. Manypenny,* 672 F.2d 761, 765 (9th Cir.1982) (court has power to reconsider earlier denial of timely motion when, in course of ruling on different motion, court decides that earlier ruling was erroneous).

■ We need not decide the issue, however, because we find that the district court implicitly declined to exercise any power it might have to consider the motion out of time when, on November 6, 1989, in denying a motion by defendant's attorney to withdraw, the court held the following: "The motion for new trial was denied. *The only matter pending is the sentencing hearing."* (Emphasis added.) Because the motion was not timely filed within the seven days set forth in Rule 29(c), the district court clearly did not err in declining to consider the defendant's motion for judgment of acquittal. We therefore do not reach the substantive questions of whether defendant's claims of ineffective assistance of counsel or prosecutorial misconduct may form the basis of a judgment of acquittal under Rule 29.[12]

## SUFFICIENCY OF THE EVIDENCE

Lema argues that the evidence was insufficient as a matter of law to sustain his convictions for aiding and abetting. He therefore appeals the district court's denial of his request for a judgment of acquittal pursuant to Fed.R.Crim.P. 29 made at the end of the government's case and renewed at the close of the evidence.

Both parties agree that in reviewing that decision, this court must take the evidence in the light most favorable to the government. *United States v. Rivera–Santiago,* 872 F.2d 1073, 1078 (1st Cir.1989). The court must determine whether, taking all the facts and reasonable inferences therefrom, a rational jury could have found the defendant guilty beyond a reasonable doubt. *Id.* at 1078–1079. *See also United States v. Paone,* 758 F.2d 774, 775 (1st Cir.1985).

The Supreme Court set out the test for determining whether a party was an aider and abetter in *Nye & Nissen v. United States,* 336 U.S. 613, 69 S.Ct. 766, 93 L.Ed. 919 (1949):

> In order to aid and abet another to commit a crime it is necessary that a defendant "in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed."

*Id.* at 619, 69 S.Ct. at 769 (quoting *United States v. Peoni,* 100 F.2d 401, 402 (2d Cir. 1938) (L. Hand, J.)). As we have repeatedly noted, " '[m]ere association between the principal and those accused of aiding and abetting is not sufficient to establish guilt; nor is mere presence at the scene and knowledge that a crime was to be committed sufficient to establish aiding and abetting.' " *United States v. Francomano,* 554 F.2d 483, 486 (1st Cir.1977) (quoting

**12.** *Compare, e.g., United States v. Torkington,* 874 F.2d 1441, 1444–1445 (11th Cir.1989) (sufficiency of evidence alone, not claim of prosecutorial misconduct, may form the basis of judgment of acquittal); *In re United States,* 286 F.2d 556, 562 n. 5 (1st Cir.1961) ("Conceivably, although we have no occasion to decide and do not decide, a judgment of acquittal might be warranted in the event that deliberate misconduct of Government counsel is so outrageous as not only to render the trial in progress unfair but also to make a fair trial in the future impossible."), *rev'd on other grounds sub nom, Fong Foo v. United States,* 369 U.S. 141, 143–144, 82 S.Ct. 671, 672–673, 7 L.Ed.2d 629 (1962) (Harlan, J., concurring) ("Even assuming that a trial court may have power, in extreme circumstances, to direct a judgment of acquittal, instead of declaring a mistrial, because of a prosecutor's misconduct—a proposition which I seriously doubt—I do not think such power existed in the circumstances of this case.").

*Snyder v. United States,* 448 F.2d 716, 718–719 (8th Cir.1971)) (citations omitted). *See also Paone,* 758 F.2d at 775.

Lema argues that in this case, his presence in Souza's vehicle was the only significant link between himself and the cocaine transaction. He cites two cases which he claims are indistinguishable on this point, *Francomano,* 554 F.2d 483, and *United States v. Mehtala,* 578 F.2d 6 (1st Cir.1978). In both *Francomano* and *Mehtala,* which arose out of the same incident, we held that there was insufficient evidence as a matter of law to convict the defendants. In those cases, the defendants were crew members and a passenger aboard a 70–foot ship from which marijuana was dumped during the approach of a Coast Guard rescue helicopter. Beyond showing that the defendants were on board, the government made no showing that the defendants were in any way connected to the captain's drug smuggling. Indeed, there was strong evidence suggesting that all of the crew members had been anxious to get berths on any ship in order to travel. This court indicated that a showing of presence, without something to connect the defendants to the crime, was inadequate, at least where the amount of marijuana was small (40 pounds) and could well have been concealed from them.

■ *Francomano* and *Mehtala* do not control the instant case. In the first place, presence on a single occasion may support a conviction for aiding and abetting if the surrounding circumstances lead to a reasonable inference that the defendant must have been a knowing participant. *See, e.g., United States v. Cuevas–Esquivel,* 905 F.2d 510, 515 (1st Cir.1990); *United States v. Luciano Pacheco,* 794 F.2d 7, 11 (1st Cir.1986) (and cases cited therein). More importantly, Lema was not merely present during a single drug transaction. Instead, the facts here are similar to those in *Paone,* 758 F.2d 774, where the evidence linking the defendant to the offense consisted of his presence at several stages of a drug transaction. We held that the jury was entitled to infer from his presence at

multiple steps in the transaction that the defendant's presence was not coincidental.

■ Here, Lema was present at the culmination of two separate drug deals with government informants. In addition, government witnesses reported that, while still in New Hampshire, Souza was reluctant to move the first drug transaction to Maine until after he had conversation with Lema and others. A rational jury could have inferred that Lema was consulted about the decision. Moreover, the evidence taken in the light most favorable to the government indicates that Lema examined the first payment and confirmed that the money appeared to be all there. It is certainly reasonable for a jury to infer from this that he knew how much should be there, knowledge that would implicate him as a participant in the offense. Finally, the evidence showed that Lema passed the bag containing cocaine to Souza in the January 25 transaction.

Lema argues, however, that there is not the same sort of "shadowing ... at nearly every step of the deal," 758 F.2d at 776, by which we distinguished *Paone* from *Francomano.* Lema was *not* present during earlier steps in these drug transactions. In addition, he was not party to or mentioned during the negotiations for either deal. He therefore argues that *Paone* requires that we find the evidence to be insufficient here.

But defendant misreads our decision in *Paone.* The quoted language does not suggest that there must be a complete shadowing at every step of a transaction to be sufficient. *Paone* merely indicates that the fact that the defendant was present more than once during critical junctures of a drug transaction allows a jury to infer that his presence was not coincidental when mere presence on a single occasion might not allow such an inference. Lema was present during the culmination of two separate transactions. As we have noted, the evidence also indicates that he confirmed that the money was all there in the first transaction and he passed the bag containing drugs during the second transaction. As in *Paone,* the jury reasonably could conclude that his claim that he was

not involved was incredible in these circumstances. We therefore hold that there was sufficient evidence for the jury to find that Lema was guilty of aiding and abetting beyond a reasonable doubt.

*Affirmed.*